**In re NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION.**

**This Matter Relates to all Cases Voluntarily Dismissed With Prejudice.[1]**

**MDL No. 1337.**

**D.N.J. Lead Civ. No. 98–4104 (WGB).**

United States District Court, D. New Jersey.

July 23, 2002.

---

1. Cases dismissed pursuant to the Court's decision of December 5, 2000, published at 198 F.R.D. 429 (D.N.J.2000).

Allyn Z. Lite, Lite, Depalma, Greenberg & Rivas, LLC, Newark, NJ, Liaison Counsel for Plaintiffs.

Prof. Burt Neuborne, New York City, Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Melvyn I. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Appearing generally on behalf of voluntarily dismissed Plaintiffs.

Barry Fischer, Law Offices of Barry Fischer, Los Angeles, CA, Appearing on behalf of Plaintiffs Mayer Fischer and Simon Frumkin.

Paul E. Kerson, Koppell, Leavitt, Kerson, Leffler & Duane, LLP, New York City, Appearing on behalf of Plaintiffs Ronald Mandowsky and Seth Feldman.

John J. Gibbons, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Liaison Counsel for Defendants.

Donald A. Robinson, John B. Livelli, Robinson & Livelli, Newark, NJ, Counsel for Amicus Curiae the Federal Republic of Germany.

## OPINION

BASSLER, District Judge.

In August, 2000, the Judicial Panel on Multi–District Litigation ("JPML" or "MDL Panel") consolidated approximately 50 Nazi-era cases before this Court. The transferred cases, primarily putative class actions against German Industry commenced by former slave laborers, were consolidated so that the Court could consider the impact of the German Foundation "Remembrance, Responsibility and the Future" ("The Foundation"), on Plaintiffs' claims. Ultimately, the overwhelming majority of putative class representatives sought voluntary dismissal of their claims with prejudice, so that they could seek compensation for their Nazi-era injuries from the Foundation. On December 5, 2000, the Court issued a detailed Opinion which permitted the putative class Plaintiffs to voluntarily dismiss their actions with prejudice. *See In re Nazi Era Cases Against German Defendants Litigation,* 198 F.R.D. 429 (D.N.J.2000).

Now before the Court are Plaintiffs' Motions to Enforce Settlement and for Declaratory Relief. In the most general terms, Plaintiffs allege that German Industry has failed to meet its obligations to make appropriate interest payments to the Foundation. Accordingly, Plaintiffs have asked the Court to interpret the parties' rights and obligations under the German Foundation law, and have asked the Court to order German Industry to make additional payments into the Foundation. Plaintiffs have asked the Court to exercise its power both pursuant to Fed.R.Civ.P. 60(b) and pursuant to an alleged reservation of jurisdiction contained in the Court's

Opinion and Orders which granted Plaintiffs leave to dismiss.

The Court has reviewed the submissions of the parties, including Plaintiffs' briefs and declarations in support of the motions, Defendants' brief in opposition, and an *amicus curiae* brief filed by the Federal Republic of Germany. The Court also heard Oral Argument on July 23, 2002. Because the Court lacks the authority to grant Plaintiffs the relief they seek, for the following reasons Plaintiffs' motions must be **denied.**

### I. *Background*

Plaintiffs have asked the Court for an order declaring that the German Foundation Industry Initiative [2] ("GEFI"), and all Defendants herein, are legally obligated to pay appropriate interest to the German Foundation "Remembrance, Responsibility, and the Future." Plaintiffs' Motion to Enforce Settlement (filed by Mr. Hausfeld) and Motion for Declaratory Relief (filed by Messrs. Neuborne, Lite, and Weiss, and joined by Mr. Kerson on behalf of Plaintiffs Mandowsky and Feldman) both seek orders declaring that German Industry owes additional interest payments to the Foundation. The Motions are substantively similar, differing slightly in the amounts of interest that they seek to have paid, and the grounds upon which additional funds are sought. The Motion to Enforce Settlement also includes allegations about other non-monetary problems with the Foundation. Procedurally, both motions ask the Court to make rulings as to the operation of the Foundation and the parties' obligations thereunder; for that reason they are treated as a single motion in this Opinion.

Attorney Barry Fischer has independently moved on behalf of Plaintiffs Mayer

---

**2.** Also referred to as the German Economy Foundation Initiative.

Fischer and Simon Frumkin for an Order to Show Cause why additional benefits should not be paid by the Foundation. In the alternative, Mr. Fischer asks that dismissals be vacated pursuant to Rule 60(b). For reasons that will be readily apparent, Mr. Fischer's claims on behalf of his clients will be addressed separately.

The Court examined both the history of the German Foundation and the plans for its operation in great detail in a pair of published opinions, *In re Nazi Era Cases Against German Defendants Litig. ("Nazi Era Cases")*, 198 F.R.D. 429 (D.N.J.2000), and *Simon Frumkin, et al. v. J.A. Jones, et al. ("Frumkin")*, 129 F.Supp.2d 370 (D.N.J.2001).[3] Rather than restate their lengthy contents, in the interest of efficiency the Court will hereby incorporate both Opinions by reference, and provide the following brief background relevant to Plaintiffs' motions.

In the Fall of 1998, the German Parliament ("Bundestag") approached the United States Government in order to facilitate a resolution of the numerous class action law suits pending in American courts against German Industry. After extensive negotiations between American Plaintiffs' attorneys, German Industry, various governments and non-governmental organizations, it was agreed that a DM 10 Billion[4] German Foundation would be established to provide a modicum of compensation to Holocaust victims.

In exchange for their promises to fund the Foundation, the German Government and German Industry were promised 1) dismissal with prejudice of all Holocaust-related litigation against German defendants pending in American courts (referred to as "legal peace" by the parties); and 2) the execution of an Executive Agreement between Germany and the United States obligating the United States to file a Statement of Interest in any future holocaust-litigation against German defendants urging American courts to view the German Foundation as the sole forum for the resolution of Holocaust-related claims against German Industry. Those Plaintiffs' attorneys who participated in the negotiation of the Foundation agreed to voluntarily dismiss their claims against German Industry with prejudice so that the Foundation could be implemented.

In July, 2000, the Bundestag passed a law creating the Foundation. Simultaneously, the Governments of the United States and Germany signed an Executive Agreement memorializing the governments' commitments to the Foundation. On October 19, 2000 Germany and the United States exchanged Diplomatic notes, causing the Executive Agreement to enter into force.

As the Court has noted previously, the Foundation "is not a government-to-government claims settlement agreement." *Nazi Era Cases*, 198 F.R.D. at 434. Instead, it is a sovereign instrumentality of the Federal Republic of Germany, established pursuant to a legislative act of the Bundestag. When the Foundation was created, American plaintiffs with claims pending against German Industry were given a choice. They could either voluntarily dismiss their claims with prejudice, and file claims for compensation with the

---

**3.** The *Frumkin* case was one of the many transferred to this Court pursuant to the MDL Panel's Consolidation Order. Unlike all of the other Plaintiffs who voluntarily dismissed their claims with prejudice in favor of the Foundation, Mr. Frumkin refused to do so. On March 1, 2001, the Court granted Defendants' Motion to Dismiss, and dismissed Mr. Frumkin's slave labor and wrongful death claims on political question and international comity grounds.

**4.** DM 5 Billion paid by the German Government, and DM 5 Billion paid by German Industry.

German Foundation, or they could continue to pursue litigation. If they opted against the Foundation and continued to pursue relief through litigation, they would be confronted by defendants' motions to dismiss supported by the United States' Statement of Interest, advocating dismissal "on any valid legal ground."

■ The moving Plaintiffs now before the Court all opted to voluntarily dismiss their claims with prejudice, in favor of the Foundation.[5] Because many of the Plaintiffs had commenced putative class actions, the intricacies of Fed.R.Civ.P. 41(a) and 23(e) required Plaintiffs to seek leave of this Court before they could dismiss their claims. *See Nazi Era Cases*, 198 F.R.D. at 438.

Fed.R.Civ.P. 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the Court directs.

In *Nazi Era Cases*, the Court engaged in a thorough analysis of whether Plaintiffs should be permitted to dismiss their claims in favor of the Foundation, and whether Plaintiffs should be required to provide the putative class with notice of the requested dismissals.[6] 198 F.R.D. at 442–46.

The Court determined that the Foundation was not the product of collusion and instead had been negotiated at arm's length. Because payment of German Industry's contribution into the Foundation was to be deferred until legal peace was obtained, the Court determined that the interests of the putative class would not be prejudiced by expedited dismissal of all the class representatives. Finally, it was readily apparent to the Court that requiring the issuance of notice to the putative class prior to dismissal would not serve the interests of justice, and would instead prejudice the aging members of the putative class. Therefore, the Court declined to order notice, and permitted voluntary dismissal with prejudice of the Plaintiff's claims.

At the time the Court considered the voluntary dismissal issue, real concerns existed about whether the Foundation would

---

**5.** This includes Mr. Fischer's client Mayer Fischer, who agreed to voluntarily dismiss his action with prejudice. *See Mayer Fischer v. Steyr–Daimler–Puch, et al.,* C.D. Cal. No. 00–8619(TJH)(D.N.J. No. 00–5494)(dismissed by way of stipulation filed with the Court on November 15, 2000).

Mr. Fischer appears to be confused about the posture of litigation involving his other client, Simon Frumkin. Although Mr. Fischer has argued that alleged payment problems with the Foundation justify vacating dismissal in *Simon Frumkin v. United States of America,* Case No. CV–01–08439 GHK (EX), four impassible barriers stand in the way of his request. 1) Simon Frumkin never sought leave to voluntarily dismiss his claims with prejudice in favor of the Foundation, so any Foundation-related problems are now irrelevant to Mr. Frumkin; 2) the Court granted Defendants' motion to dismiss and *involuntarily* dismissed Simon Frumkin's claims with prej-

udice in *Frumkin v. J.A. Jones,* 129 F.Supp.2d 370 (D.N.J.2001); 3) the Court believes that the case mentioned by Mr. Fischer, *Frumkin v. USA,* is a separate takings action commenced in California after the dismissal of the case against *JA Jones,* which was never transferred to this Court; and 4) the Court believes that *Frumkin v. USA* has not been dismissed, but was instead transferred from California to the Court of Federal Claims in Washington, where it is still pending. Given the foregoing, Mr. Fischer's requests on behalf of Simon Frumkin are quite obviously **denied**.

**6.** Dismissal of the named-Plaintiffs' claims with prejudice served to withdraw the claims of all putative class members without prejudice. The Court's notice inquiry was designed to determine whether other potential class representatives should be given the opportunity to intervene before the entire class's claims were withdrawn.

ever come to fruition. Plaintiffs were particularly concerned that German Industry would not succeed in raising its agreed-upon DM 5 Billion contribution to the Foundation. Therefore, many of the Plaintiffs initially sought dismissals that were expressly conditioned on the Foundation reaching full funding. Such conditional dismissals were unacceptable to Defendants. Defendants were concerned that legal peace in American courts would not be obtained, and felt that anything less than unconditional dismissal with prejudice would not be sufficient to trigger operation of the Foundation.

The agreed upon solution was to make all of the Court's dismissal orders expressly subject to Fed.R.Civ.P. 60(b). As the Court held in its Opinion:

> of great concern to Plaintiffs in these actions is the prospect that full funding of the Foundation might never be achieved, and that as a result they would have dismissed their claims with prejudice for nothing. The Court shares this understandable concern, and for this reason all of the Orders of Dismissal (with the consent of the parties) were made expressly subject to Federal Rule of Civil Procedure 60(b). Rule 60(b) provides that a court may relieve a party from a final judgment or order for circumstances such as fraud, mistake, misrepresentation, or any other such reason justifying relief from the operation of the judgment or order.
>
> Pursuant to Rule 60(b), should the Foundation not achieve full funding, Rule 60(b) would provide the Plaintiffs who have dismissed with prejudice their complaints in reliance on full funding with an avenue for relief. Given the commitment to the Foundation by the Federal Republic of Germany and by German Industry, many companies of which were not in existence during the Nazi era, an application under F.R.C.P. 60(b) is most unlikely.

198 F.R.D. at 446–47 (internal citations omitted).

On December 31, 2000, shortly after the Court allowed Plaintiffs to dismiss their action, the German government made its final required contribution to the Foundation, which brought the Foundation's funding level up to DM 5 Billion. Payment of GEFI's matching DM 5 Billion contribution was deferred until the attainment of legal peace. No payments could be made from the Foundation to holocaust victims, even from the funds contributed by the German government, until legal peace was obtained.

On December 14, 2000, Chief Judge Mukasey in New York granted leave to dismiss Holocaust-era cases against German insurers pending before him. On March 1, 2001, this Court dismissed *Frumkin,* which was the last case against German Industry pending before it.

With the dismissal of *Frumkin,* only a handful of cases against German banks remained pending before Judge Shirley Wohl Kram in the Southern District of New York. Judge Kram declined to grant leave to dismiss the German bank cases unless the German Foundation made certain payments to a group of plaintiffs who had previously settled their claims against Austrian banks. *In re Austrian and German Bank Litigation,* 2001 WL 228107, 2001 U.S. Dist. LEXIS 2311 (S.D.N.Y. March 7, 2001). On May 17, 2001, the Second Circuit issued a writ of Mandamus requiring Judge Kram to allow the German banking cases to be dismissed voluntarily. *In re Austrian, German Holocaust Litigation (Duveen),* 250 F.3d 156 (2d Cir. 2001). On May 18 and 21, 2001, Judge Kram allowed the German banking cases to be dismissed, opening the way for full funding of the German Foundation.

On May 30, 2001, the Bundestag found that legal peace had been established, de-

spite the pendency of a single slave labor appeal in the Ninth Circuit. GEFI accepted the Bundestag's findings, and between June–October, 2001 allegedly transferred DM 5 Billion,[7] plus an agreed upon DM 100 million in interest, to the Foundation. Foundation distributions began immediately in June, 2001, and have since totaled more than DM 2.6 Billion to over 600,000 elderly Holocaust victims.

Plaintiffs do not claim that the Foundation has failed, and concede that substantial funding of the German Foundation has occurred. Instead, the present dispute is largely over accounting methods and interest payments, and has to do with the manner in which GEFI's contributions to the Foundation were calculated.

The dispute over interest stems from the mechanics of German Industry's contribution to the Foundation. Generally, the Foundation agreement contemplated that before legal peace was obtained, German Industry would place its DM 5 Billion contribution into a trust as a showing of good faith. Once legal peace was obtained, German Industry agreed to give the Foundation the DM 5 Billion held in trust, as well as DM 100 Million in interest

accrued on the trust funds.[8] Because of delays associated with obtaining legal peace, more than DM 100 Million in interest allegedly accrued on the trust funds. Plaintiffs argue that while the additional interest should have been contributed to the Foundation, German Industry impermissibly opted to use the accrued interest to offset its DM 5 Billion obligation. Plaintiffs' fundamental concern is that German Industry has ignored its obligations to pay all accrued interest to the Foundation, and is instead benefitting from a windfall.[9]

Although Plaintiffs have a number of other specific complaints about GEFI's practices and about the practices of the Foundation, in general terms Plaintiffs claim that GEFI has used various accounting practices to both overstate the amount actually contributed to the Foundation and hide profits generated from use of Foundation funds both before and after legal peace was obtained. Plaintiffs have also criticized German Banks for rampant conflicts of interest in their management of the Foundation, including substantial profiteering on currency exchanges that were required to initiate payments by various Foundation partner organizations, which allegedly reduced the benefits received by certain holocaust survivors.[10]

7. Counsel for Plaintiffs disagree as to the amount actually transferred, claiming it to be either DM 4.45 Billion or DM 5 Billion. Mr. Hausfeld has also argued that GEFI's contribution was impermissibly made up of credits for payments made to other organizations.

8. The parties dispute whether the DM 100 Million figure represents a minimum required interest contribution or a maximum required interest contribution.

9. The parties' disagreement is over language in the Foundation agreement Joint Statement, which reads in relevant part:

> Contributions from the German Government will begin earning interest for the benefit of the Foundation immediately upon being made available to the Foundation ... German company funds will continue to be

collected on a schedule and in a manner that will ensure that the interest earned thereon before and after their delivery to the Foundation will reach at least 100 million DM.

(Joint Statement, at 5.) Both the Foundation's Board of Directors and the German Federal Ministry of Finance, which has oversight in this matter, are of the opinion that German Industry has fulfilled its obligations by contributing the full DM 5 Billion plus DM 100 Million in interest to the Foundation. (*See* Defendants' Response, Ex. 2.)

10. Many of the alleged problems with the Foundation were described by Judge Weinstein in *Ukrainian Nat. Ass'n of Jewish Former Prisoners of Concentration Camps & Ghettos v. U.S.*, 182 F.Supp.2d 305 (E.D.N.Y.2001). The *Jewish Former Prisoners* case was commenced

## II. *Analysis*

Plaintiffs argue that in order to achieve full funding of the German Foundation in accordance with the financial obligations undertaken by the signatories of the Foundation agreement, the Court should 1) issue declaratory relief clarifying the duty of GEFI to pay interest at an appropriate market rate in connection with the deferred payment of its DM 5 Billion principal obligation from July 17, 2000 to the date that GEFI's payment was finally completed; 2) declare that GEFI is obligated to account to the Foundation for all interest earned by GEFI on contributions received by GEFI during the deferral period and held for ultimate transfer to the German Foundation; 3) declare that approximately DM 714 million in interest, less actual interest contributed, is due and owing to the Foundation from GEFI.[11]

Plaintiffs seek the preceding relief "pursuant to the 'avenue of relief' designed to

assure full funding provided in connection with the dismissal proceedings." (Neuborne Decl. ¶ 5.) Relying on the language contained in the Court's Order of dismissal that "plaintiffs' voluntary dismissal was made based on their understanding that the funding of the German Foundation pursuant to the Berlin Agreements will be implemented in a timely fashion," (Order of Dismissal, Nov. 14, 2000), Plaintiffs seek to "move to enforce the settlement they reached in *Nazi Era Cases* because the Foundation has not been fully funded." (Plaintiff's Memorandum in Support of Motion to Enforce Settlement, p. 1.)

Unfortunately, there are a number of procedural defects with Plaintiffs' requests that prevent the Court from reaching the merits of their potentially valid concerns about the Foundation. First, contrary to Plaintiffs' beliefs, the Court did not retain jurisdiction to enforce settlement in these disputes.[12] Second, having concluded that

by Mr. Hausfeld against the United States, on a guarantor theory of liability, seeking to have the United States rectify the problems with the Foundation. A related action was commenced against GEFI by Mr. Neuborne. Both actions were subsequently withdrawn on Plaintiffs' motions. *See* 178 F.Supp.2d 312 (E.D.N.Y.2001).

11. Although Mr. Hausfeld's submissions are filled with a great many criticisms of the manner in which the Foundation has been operated, Plaintiffs have not explicitly asked the Court to remedy any of the perceived problems with the Foundation. Instead, Plaintiffs have only made the three enumerated requests for declaratory relief, all of which are directed to GEFI's (and its constituent members') interest obligations.

The Court believes that Plaintiffs were wise not to pursue claims directed to the Foundation's operation, as any such claims are doomed to failure. This Court wishes to make it absolutely clear that it will not entertain any independent actions directed to the conduct of the Foundation; for all of the reasons articulated in its prior published

Opinions, the Court is absolutely certain that matters pertaining to the operation of the Foundation are beyond the purview of American courts, and must be resolved via existing mechanisms in Germany. That having been said, the alleged promises of German Industry made to American plaintiffs in exchange for legal peace present distinct factual and legal issues that are not as easily disposed of.

12. The Court does not wish to imply here that the Foundation itself is an enforceable settlement in the traditional sense. As the Court held in *Nazi Era Cases*, "the Foundation is *not* properly a 'settlement' in the legal sense." 198 F.R.D. at 436 (emphasis added.) It is instead a sovereign instrumentality of the German Government. A number of the Plaintiffs in this dispute have commenced a new action, *Elly Gross, et al. v. The German Foundation Industrial Initiative, et al.*, D.N.J. No. 02–cv–2936 (WGB), filed on June 20, 2002, designed to take on GEFI and its contributors directly. Questions surrounding the Foundation agreement's enforceability against German Industry by an American court will likely be addressed, if not definitively resolved, in that matter.

the Court did not retain jurisdiction, the narrow post-dismissal avenue of relief left open pursuant to Rule 60(b) does not give the Court the authority to issue the declaratory orders that Plaintiffs seek.

In federal jurisprudence, there is no more axiomatic a principle than that federal courts are courts of limited jurisdiction. It is presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction. *Turner v. Bank of North America,* 4 U.S. (4 Dall.) 8, 11, 1 L.Ed. 718 (1799); *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182–183, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Relatedly, just because a court may once have had jurisdiction over an active case or controversy does not vest that court with continued jurisdiction over the dispute after the action has been dismissed on the merits.

In *Kokkonen v. Guardian Life Insurance Company of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), the United States Supreme Court flatly rejected the notion that after dismissal of a diversity action pursuant to a settlement agreement, a district court has continued jurisdiction to decide an enforcement motion under its inherent supervisory power. Although Fed.R.Civ.P. 60(b) might vest a court with the power to vacate a dismissal in the event an agreement is breached, "enforcement of the settlement agreement ... is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Kokkonen,* 511 U.S. at 378–79, 114 S.Ct. 1673. Thus, unless the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal or the actual terms of the settlement agreement had been made part of the order of dismissal, federal jurisdiction would not be conferred by a mere relationship "so tenuous as the

breach of an agreement that produced the dismissal of an earlier federal suit." *Id.* at 379, 114 S.Ct. 1673.

The Third Circuit has taken a narrow view of a District Court's power to enforce a settlement agreement in a dismissed case, absent an express reservation of jurisdiction. In the recent case of *Shaffer v. GTE North, Inc.,* 284 F.3d 500, 503 (3d Cir.2002), the court reaffirmed that neither mere reference to the fact of a settlement nor actual approval of the terms of a settlement agreement suffice to make the settlement a part of the dismissal order. Although the dismissal order in *Shaffer* expressly indicated that the action had been dismissed in favor of a settlement, because the district court had not expressed an intent to retain jurisdiction over the settlement or incorporated the specific terms of the parties' obligations under the settlement into its order, the Third Circuit found that the district court lacked jurisdiction to enforce the settlement. 284 F.3d at 503–504. In fact, even though the district court subsequently invited Plaintiff to file a motion to enforce settlement, the mere fact that there may have been an "unexpressed intent [to retain jurisdiction in the original order] is insufficient to confer subject matter jurisdiction." 284 F.3d at 504.

Plaintiffs' protestations to the contrary, the Court's Orders of dismissal in the slave labor cases did not retain jurisdiction to enforce a settlement, or incorporate the particular terms of agreement between the parties. While the Court's orders of dismissal did include the language "that plaintiffs' voluntary dismissal was made based on their understanding that funding of the German Foundation pursuant to the Berlin Agreements will be implemented in a timely fashion," this language does not memorialize Defendants' obligations under a settlement agreement, and is not itself enforce-

able. Instead, the language sets the stage for the Court's dismissal expressly pursuant to Rule 60(b), which will be discussed later in this Opinion. As the Third Circuit held in *Shaffer*, "language in a dismissal order providing for the reinstatement of an action if a settlement agreement is not consummated" is not sufficient to confer enforcement power upon the Court.

Plaintiffs also make much of the fact that the Court examined the terms of the Foundation at length in its December 5, 2000 Opinion, and claim that by placing its stamp of approval on the terms of settlement, the Court inherently reserved power to enforce those terms. The Court disagrees, and finds that Plaintiffs' argument does not comport with the analysis actually undertaken by the Court in its Opinion.

In the *Nazi Era Cases* Opinion, the Court was required to examine the circumstances behind Plaintiffs' request for dismissal, to determine whether the request was the result of collusion or would prejudice the absent putative class. The issue was not whether settlement was favorable or whether the amount of funding promised was adequate; the issue was whether dismissal in favor of the Foundation was justified and could be permitted without notice to the putative class. For the Court to engage in such an analysis without investigating and discussing the terms of the Foundation agreement itself would have been impossible. That the Court engaged in the analysis does not mean that the Court approved all of the terms of the purported settlement.[13] Similarly, the mere fact that the Court approved *dismissal,* and found that there was no evidence of collusion or prejudice, does not mean that the Court agreed to retain jurisdiction over a settlement and be a watchdog over the parties' conduct after dismissal.[14] Such was never the Court's intention.

As was the case in both *Kokkonen* and *Shaffer,* the detailed terms of an agreement that led to dismissal were placed on the record prior to the Court's approval of dismissal. As was also the case in both *Kokkonen* and *Shaffer,* that fact alone is insufficient to vest a district court with jurisdiction to enforce a settlement after dismissal.

This Court is mindful of the *Kokkonen* Court's parting words:

> The short of the matter is this: The suit involves a claim for breach of a [settlement] contract, part of the consideration for which was dismissal of an earlier federal suit. No federal statute makes that connection (if it constitutionally could) the basis for federal-court jurisdiction over the contract dispute. The facts to be determined with regard to such alleged breaches of contract are quite separate from the facts to be determined in the principal suit, and automatic jurisdiction over such contracts is in no way essential to the conduct of federal-court business.

511 U.S. at 381, 114 S.Ct. 1673.

The underlying disputes in the voluntarily dismissed cases had to do with Nazi-

---

13. Quite the contrary. In making its determination that dismissal of the putative class actions with prejudice and without notice was the most appropriate way to proceed, the Court explicitly noted that "nothing in [the December 5, 2000] opinion should be interpreted as approving the fairness of the Foundation ... this Court has only examined the issues of collusion and prejudice, and their impact on voluntary dismissal in the pre-certification context." 198 F.R.D. at 442 n. 19.

14. It bears mentioning that the dismissed claims were those of the individual Plaintiffs, and not of an entire certified settlement class. As the Court noted in *Nazi Era Cases,* the oversight of dismissal of a certified settlement class is more substantive than the oversight of a putative class's dismissal. 198 F.R.D. at 439.

era corporate atrocities committed in factories and camps half a world away from this Court, over sixty years ago. The motions to enforce settlement have to do with statements allegedly made by the Defendant corporations in boardrooms and before this Court over the past two years. Although one begat the other, jurisdiction over the one does not beget jurisdiction over the other.

 Absent retention of jurisdiction in an order of dismissal, "enforcement of [a] settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Kokkonen,* 511 U.S. at 382, 114 S.Ct. 1673. While this Court may have independent diversity jurisdiction over the settlement dispute, the proper vehicle to exercise that jurisdiction would not be the pending motions, but instead a separate action to enforce settlement, of the variety that Plaintiffs have already commenced in this Court.

Such a vehicle is procedurally more appropriate than the pending motions. With their pending motions, the moving Plaintiffs have essentially asked the Court to rule globally, on behalf of all Plaintiffs generally against all Defendants generally. While such broad strokes might have been appropriate had a class been certified, or a single consolidated complaint filed against a consolidated group of German defendants, both had yet to occur in the slave labor actions. Instead, the cases dismissed by the Court were grounded on approximately 50 separate Complaints filed by named individuals against particular companies.

As a matter of procedure, Plaintiffs' separate action, designed solely to address claims related to settlement, will allow for more ordered consideration of Plaintiffs' allegations. While Plaintiffs will undoubtedly need to resolve threshold issues related to service of process and GEFI's standing to be sued, these issues would also have required resolution before the Court could have reached the merits of Plaintiffs' nebulous motions to enforce settlement. Provided that Plaintiffs resolve all of the threshold problems that may arise, the pending action will permit the Court to consider Plaintiffs' clearly defined allegations against a concrete group of Defendants. More importantly, it will allow those named Defendants to respond to Plaintiffs' allegations in a more procedurally appropriate manner.

 Turning next to Plaintiffs' Rule 60(b) argument, the Court finds that Rule 60(b) does not provide the Court with the authority to grant Plaintiffs the relief they seek. Based on the Court's express dismissal pursuant to Rule 60(b), Plaintiffs claim that "it is clear that the Court intended to provide Plaintiffs an avenue for relief should full funding of the Foundation not be achieved and that the obligations to timely implement the funding of the German Foundation to the Berlin Agreements was incorporated in the Court's order." (Plaintiff's Memorandum in Support of Motion to Enforce Settlement, p. 24.) Plaintiffs are partially correct, but they misapprehend the nature of relief contemplated by the Court.

In making dismissal subject to Rule 60(b), the Court hoped to avoid a circumstance wherein Plaintiffs would have dismissed their actions in exchange for nothing more than a bill of goods. Given the real possibility that the Foundation might never have begun to pay benefits, the Court did not wish to saddle elderly Plaintiffs with dismissals on the merits without first providing some prospect of renewing their litigation before the Court. Such relief from judgment is precisely what the Rule 60(b) device contemplates.

 Rule 60(b) provides in relevant part that:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) ... misrepresentation, or other misconduct of an adverse party; ... (6) any other reason justifying relief from the operation of a judgment.

Rule 60(b) is not a tool to resolve conflicting interpretations of the parties legal obligations; rather it is a mechanism that can relieve a party from the burdens of a judgment on the merits when it becomes apparent that the judgment has been incurred in exchange for hollow promises. As the Third Circuit recently held in *Shaffer*, "reinstatement of an action, which revives the underlying claim and sends the litigants back to the original battlefield, is totally different from the enforcement of the terms of a settlement agreement because one of the parties has not complied with those terms." 284 F.3d at 503.

 It is most important that Plaintiffs have not expressly asked the Court to vacate the dismissals of their actions,[15] and have not asked the Court to allow their litigation against German Corporations to continue.[16] Had Plaintiffs approached the Court citing irreparable problems with the Foundation and asked that their litigation against particular German companies be reinstated, the Court's inquiry would necessarily have gone to the merits of Plaintiffs' grievances. Assuming the Court agreed with Plaintiffs, litigation would have resumed where it left off, most likely with consideration of Defendants' motions to dismiss. In no event, however, would the Court have been in a position to issue the Orders sought by Plaintiffs directed to either GEFI or the Foundation itself.[17]

---

**15.** Both in their reply briefs and at oral argument, Plaintiffs imply that a motion to vacate judgment would be the next step if the settlement is not enforced. Rather than having the Court vacate dismissals at this stage, however, Plaintiffs hope to obtain something tantamount to an advisory opinion from the court, and have the court "announce its legal conclusions prior to vacating the dismissals. At the minimum, the Court is empowered to enter a conditional Rule 60(b) order, reopening the slave labor litigation within a fixed period of time unless appropriate interest payments are forthcoming." (Reply on Motion for Declaratory Relief, p. 6.) The Court disagrees that it is so empowered. If the Court lacks the power to use Rule 60(b) to expressly enforce a settlement, it certainly lacks the power to use Rule 60(b) to induce Defendants into modifying their conduct upon pain of renewed litigation.

**16.** Only Mr. Fischer has asked the Court to do so, on behalf of Plaintiff Mayer Fischer. Mr. Fischer claims that each Plaintiff was promised DM 30,000 under a litigation terminating settlement agreement, but that such payments were never made. While the Court is aware that an agreement for additional payments to named Plaintiffs was reached in exchange for dismissal of their claims, the precise terms of that agreement were never placed before the Court. *See Nazi Era Cases*, 198 F.R.D. at 443 n. 21. To the best of the Court's understanding, such claims were either to be paid by the Foundation out of the fund reserved for Attorneys' Fees, or were to be paid by attorneys themselves to their clients out of the substantial fees awarded directly to Plaintiffs' attorneys. In either event, Mr. Fischer's application to vacate judgment is utterly devoid of factual support, and fails to sufficiently demonstrate why relief from judgment is justified. It is therefore **denied**. Mr. Fischer's request for an Order to Show Cause to investigate the alleged non-payment is similarly **denied**, as the Court lacks the authority to issue such post-dismissal relief for all of the reasons generally stated in the body of this opinion.

**17.** It bears mentioning that neither GEFI nor the German Foundation are parties to any of the actions that were voluntarily dismissed in December, 2000. Therefore, the Court questions how it would have the power to enforce a judgment somehow directed to either party pursuant to Rule 60(b) without their first being brought into one of the existing dismissed actions.

In filing their post-dismissal motions, the one thing that Plaintiffs did not request was the one thing that the Court would have had the power to grant: relief from the voluntary dismissals with prejudice, so as to allow litigation to continue. Before moving for such relief, the Court would urge Plaintiffs to review its decision in *Frumkin,* and question whether it is desirable to abandon the arguably flawed but functioning Foundation in favor of highly uncertain litigation.

### III. *Conclusion*

Although the Court is distressed by Plaintiffs' allegations that German Industry may be shirking its obligations, it can not allow those allegations to trump basic tenets of jurisdiction and the rules of procedure. Accordingly, Plaintiffs' Motions to Enforce Settlement and for Declaratory Relief must be **denied**.